**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SANDRA STEELE,<br><br>                Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>                Defendant. | CASE NO. 1:21-CV-01226-AMK<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Sandra Steele ("Plaintiff" or "Ms. Steele") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.)  This matter is before this Court by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 20.)  For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On September 24, 2019, Ms. Steele filed an application for DIB and SSI. (Tr. 229.)  She alleged a disability onset date of July 19, 2018, later amended to July 24, 2018. (Tr. 236, 103-19.)  She alleged disability due to diabetes mellitus II, neuropathy, sleep apnea, asthma, aortic and mitral valve regurgitation, lung nodule, gastrointestinal bleed, spleen nodule, neurological problems, and hernia. (Tr. 122.)  Ms. Steele's application was denied at the initial level (Tr. 120-

21) and upon reconsideration (Tr. 162-63), and she requested a hearing (Tr. 190).  On October

15, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 77-102.)

On December 9, 2020, the ALJ issued a decision finding that Ms. Steele had not been

under a disability within the meaning of the Social Security Act from July 24, 2018, through the

date of the decision.  (Tr. 52-71.)  On June 4, 2021, the Appeals Council denied Ms. Steele's

request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4.)

On June 22, 2021, Ms. Steele filed a Complaint challenging the Commissioner's final

decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 16, 18.)

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Steele was born in 1968 and was 50 years old on the alleged disability onset date,

making her an individual closely approaching advanced age under Social Security Regulations.

(Tr. 69.)  She had at least a high school education.  (*Id*.)  Ms. Steele had not worked since July

24, 2018, the alleged onset date.  (Tr. 54.)

### B.  Medical Evidence

Although the ALJ identified multiple severe and non-severe physical and mental

impairments (Tr. 54-55), Ms. Steele's challenge primarily relates to the ALJ's evaluation of her

functional ability to stand, walk, and use her upper extremities.  (ECF Doc. 16, pp. 1, 14-21.)

The evidence summarized herein is accordingly focused on evidence pertaining to those abilities.

#### 1.  Relevant Treatment History

On July 3, 2018, Ms. Steele saw Kelly Bartley, RN, MSN, NP-C, at the Cleveland Clinic

Heart and Vascular Institute, for a follow up for chest pain, hyperlipidemia, hypertension, and

palpitations.  (Tr. 888.)  At her prior visit in May, she had reported occasional difficulty moving

her left arm, weakness, fatigue and dizziness.  (Tr. 888-89.)  A tilt table test in July was negative and an echocardiogram showed no abnormalities.  (Tr. 888.)  A stress test showed no ECG changes consistent with ischemia; she achieved 76% of her predicted maximal heart rate but had a fair functional capacity.  (*Id*.)  NP Bartley recommended imaging of the coronary arteries and continued prescriptions for Lipitor, Lisinopril, and vitamin D.  (Tr. 889.)  A July 27, 2018 CTA scan showed normal chest wall, normal cardiac chambers except for a prominent left atrium, normal coronary arteries, and a three millimeter lung nodule in the left lingula.  (Tr. 837-39.)

On July 23, 2018, Ms. Steele presented to the emergency room after an automobile accident, and was diagnosed with a closed head injury, post concussive syndrome, cervical strain, and a lumbar strain.  (Tr. 393, 396.)  Examination results were normal, with no external signs of trauma.  (Tr. 396.)  CT scans of her head and spine showed no acute abnormalities, but demonstrated mild degenerative changes of the spine and a seven millimeter lung nodule in the right middle lobe.  (Tr. 398-401.)  She was provided pain medication and discharged.  (Tr. 404.)

Ms. Steele was seen for a pulmonary consultation with Deena Khabbaza, M.D., at the Cleveland Clinic Respiratory Institute on September 5, 2018 for a lung nodule and dyspnea on exertion.  (Tr. 475, 479.)  She reported a history of asthma that got worse as she gained weight, sleep apnea, and daytime hypersomnia.  (Tr. 475-76.)  She had not been able to use her CPAP machine because it had been damaged, but also did not use it frequently when it was functional because it made her feel like she was suffocating.  (*Id*.)  Examination results were normal.  (Tr. 478.)  Dr. Khabbaza concluded that Ms. Steele's dyspnea was likely multifactorial, including deconditioning, allergic rhinitis, and obesity.  (Tr. 479.)  She advised Ms. Steele not to use her albuterol every day, and to log the occasions when she needed a rescue inhaler.  (*Id*.)  She also recommended that Ms. Steele follow up with a sleep specialist.  (*Id*.)

On September 6, 2018, Ms. Steele presented to Christopher Phillips, PA-C, for follow-up evaluation of her right carpal tunnel syndrome.  (Tr. 472-75.)  She had undergone a right carpal tunnel injection in June 2018 with significant improvement in pain, but reported a return of pain and requested another injection.  (Tr. 473.)  Her physical examination was normal with the exception of tenderness, positive Tinel sign at carpal tunnel, and positive Phalen's test.  (Tr. 474.)  Undated EMG findings in her treatment notes described right median neuropathy consistent with a clinical diagnosis of moderate carpal tunnel syndrome and an absent medial plantar mixed nerve response of uncertain clinical significance.  (*Id.*)  She received a right carpal tunnel cortisone injection.  (Tr. 474-75.)

Ms. Steele called the Cleveland Clinic to request that her CPAP machine be repaired or replaced on September 7, 2018.  (Tr. 471.)  She reported she had not used it for three months and was experiencing excessive daytime sleepiness and drowsiness when driving.  (Tr. 471-72.)  A new CPAP was ordered and Ms. Steele was referred to an ENT specialist for nasal congestion and to neurology for numbness in her upper extremities and balance issues.  (Tr. 472.)

Ms. Steele attended another follow-up with PA Phillips for right carpal tunnel syndrome on November 6, 2018.  (Tr. 466-69.)  She reported significant improvement in pain following her September 2018 injection, but a subsequent return of symptoms such as pain, numbness, tingling, and difficulty with pincer strength.  (Tr. 467.)  Her physical examination findings remained the same.  (Tr. 468.)  PA Phillips advised that she would not be a candidate for carpel tunnel release surgery until her blood glucose was below 150.  (Tr. 469.)  She was to meet with endocrinology that day to discuss management and call the office to make arrangements for a carpal tunnel release surgery once she had better optimization of her blood glucose.  (*Id.*)

The same day, Ms. Steele attended an initial diabetes assessment with endocrinologist Lea El Hage, M.D.  (Tr. 462-66.)  She reported a thirty-pound weight gain since May 2018, and that she could not exercise much due to nerve pain.  (Tr. 462.)  Her physical examination was normal, except that her weight was 294 pounds, her body mass index ("BMI") was 52.09, and she displayed a lipodystrophy habitus, central edema, supraclavicular fullness, and dorsocervical fat.  (Tr. 465.)  Her hemoglobin A1c was measured at 7.5, above her target of 7.0.  (Tr. 465-66.)  She was continued on prescriptions for Actos, metformin, Amaryl for diabetes and started on phentermine for obesity; her neuropathy was noted to be controlled on Lyrica.  (Tr. 466.)

Ms. Steele attended an office visit with her primary care provider Haralambie Siscue, M.D., on November 13, 2018 for hypertension, uncontrolled type-two diabetes without complication, dyslipidemia, class 3 severe obesity, and vitamin D deficiency.  (Tr. 460-62.)  Her physical examination findings were normal and Dr. Siscue observed that her hypertension and dyslipidemia were controlled.  (Tr. 460-61.)  Dr. Siscue also noted improved control of her diabetes and recommended that she continue current medications and engage in regular aerobic exercise and weight loss.  (Tr. 461.)

On November 14, 2018, Ms. Steele saw neurologist Peter Bambakidis, M.D., for symptoms that included dizziness, inexplicable falls, numbness and tingling in the upper limbs and left thigh, and headaches.  (Tr. 459.)  Dr. Bambakidis noted that MRIs failed to reveal a structural or vascular cause for the symptoms.  (*Id*.)  In light of normal examination findings, Dr. Bambakidis suggested an EEG might be helpful if the reported symptoms persisted.  (Tr. 460.)

Ms. Steele attended a follow-up appointment for diabetes with Dr. El Hage on November 27, 2018.  (Tr. 456-59.)  She reported having lost two to three pounds and noted life stressors and eating a lot of vending machine food.  (Tr. 456.)  Her physical examination findings were largely

the same as her prior visit.  (Tr. 458.)  Dr. El Hage increased metformin and phentermine, and instructed Ms. Steele to return in four weeks.  (Tr. 459.)

Ms. Steele presented to the Cleveland Clinic Sleep Disorders Center on December 18, 2018 for follow up regarding her obstructive sleep apnea ("OSA").  (Tr. 453-55.)  Her last visit was October 30, 2017.  (Tr. 453.)  She was noted to be noncompliant with CPAP therapy, with a history of severe OSA and complaints of excessive day time sleepiness and drowsiness when driving.  (*Id*.)  She was sleeping about five hours per night.  (Tr. 454.)  A download of her CPAP pressure revealed she was using the wrong pressure setting, and she reported she "ha[d] not been able to maintain compliance due to difficulty breathing."  (Tr. 455.)  She also complained of pain due to carpal tunnel and neuropathy, and was referred to neurology for numbness and balance issues.  (Tr. 453-54.)  Harneet Walia, M.D., recommended that she restart CPAP use at the appropriate pressure level, take precautions when driving, and lose weight.  (Tr. 453, 455.)

Ms. Steele returned for a diabetes follow-up visit with Dr. El Hage on December 26, 2018.  (Tr. 450-53.)  She reported a five-pound weight gain, pain, and not exercising much.  (Tr. 450.)  Her physical examination findings remained the same.  (Tr. 452.)  Her medications were adjusted, and it was noted she could not tolerate the metformin increase.  (Tr. 453.)  She was instructed to return in two months.  (*Id.*)

On January 3, 2019, Ms. Steele was seen by Benjamin Abraham, M.D., in the Cleveland Clinic Pain Management Department for pain in the thoracic cavity and throughout her body.  (Tr. 448-49.)  Her listed diagnoses included uncontrolled type two diabetes with neuropathy, obesity, myalgia, and gastrointestinal hemorrhage associated with a gastric ulcer.  (Tr. 449.)  Examination results were normal except for an antalgic gait, pain to palpation over her lumbar paraspinal muscles, positive facet loading, and a general note of "loss of sensation."  (*Id*.)  Dr.

Abraham noted that treatment options were limited due to her financial circumstances and lack of insurance, recommended "neurontin v. lyrica based on cost," and identified a possible assistance program with no cost. (*Id*.) Ms. Steele indicated she was aware that her pain would likely persist so long as her diabetes remained uncontrolled, and reported she was making some changes to diet but that money was tight. (*Id.*)

A respiratory therapy at home PAP monitoring report dated March 14, 2019 indicated that Ms. Steele's compliance standards had not been met. (Tr. 447.) No current data was noted, and existing data reflected usage below the recommended pressure, for only fifteen of thirty days (50%), and only nine days of usage for four or more hours. (*Id.*)

Ms. Steele presented to the emergency room on August 13, 2019 after a fall, complaining of left shoulder and chest wall pain. (Tr. 423, 427.) She also reported a history of frequent falls that year, possibly due to diabetic neuropathy. (Tr. 427.) Her primary assessment was within normal limits, with notes suggesting an impaired gait. (Tr. 424-25.) Her physical examination findings included full range of motion in all extremities and weightbearing without difficulty, but mild tenderness to her left anterior shoulder girdle and infrascapular region. (Tr. 429-30.) X-ray imagery of the left shoulder and chest noted no acute traumatic injuries. (Tr. 430-31.) Her diagnoses included diabetic neuropathy, contusion of left shoulder, and chest wall contusion. (Tr. 431.) She was advised to treat any aches or pains with Tylenol. (*Id*.)

Ms. Steele was seen by Marianne J. Parker, CNP, at Lorain County Health and Dentistry on September 23, 2019 for type two diabetes with hyperglycemia, hypertension, fatigue, obesity, and a cutaneous abscess of the groin. (Tr. 772-81.) Her blood glucose measured 400 that day. (Tr. 772.) She reported being prescribed metformin and glimepiride, but said she was unable to take metformin due to vomiting and had not been checking her blood sugar at home due to

neuropathy. (Tr. 776.) Physical examination findings were normal except for a BMI of 47.12 and abscesses on her groin, thighs, and lower abdomen. (Tr. 778-79.) She was referred to a dietician, optometrist, podiatrist, and wellness coordinator, prescribed medications for her groin abscess, instructed to check and log her blood sugar levels three times a day, and advised to return in two weeks. (Tr. 772-74.)

On September 25, 2019, Ms. Steele received emergency treatment from Erin Fenoff, D.O., for complaints that included intermittent lightheaded spells, sharp shooting chest pains, a racing heartbeat, diffuse muscle cramping, severe charley horses, boils on her abdomen and lower extremities, and diabetic neuropathy. (Tr. 662.) Physical examination results were in the normal range, except she was noted to be morbidly obese with multiple superficial abscesses on her thighs. (*Id*.) Dr. Fenoff believed the reported muscle cramping to be related to Ms. Steele's diabetic neuropathy (Tr. 663.) Ms. Steele's abscesses were drained and she was discharged with instructions to follow up with her primary care physician and wound care. (Tr. 663, 665.) When Ms. Steele followed up with the University Hospital Elyria Wound Care Center five days later, her wounds were "essentially healed." (Tr. 736-38.)

Ms. Steele was seen by Jennifer Casey, M.D., at Lorain County Health and Dentistry on October 7, 2019 for follow-up regarding her diabetes and abscesses. (Tr. 767-69.) Ms. Steele reported that she was unable to afford insulin and had trouble at times tolerating metformin, and could only usually only take one per day. (Tr. 768.) Examination results were normal, except for a BMI of 47.74, large pannus, and scarring on her abdomen and thighs from prior cysts. (Tr. 770.) Dr. Casey noted intentional underdosing of medication due to financial hardship, changed Ms. Steele to once daily extended-release metformin, continued Amaryl, added alogliptan, and asked a community support worker to aid Ms. Steele in obtaining patient assistance. (Tr. 767.)

8

Ms. Steele was seen by her primary care provider Dr. Siscu on November 5, 2019. (Tr. 949-52.) She complained of frequent falls, wheezing on and off at night, and bilateral shoulder and low back pain. (Tr. 949.) She reported her blood glucose was getting lower since recently starting Basaglar. (*Id.*) Her physical examination findings were normal except for a weight of 266 pounds, blood pressure of 142/80, and tenderness to palpation of the lower back and anterior shoulders. (Tr. 949-50.) Lab results from November 1, 2019 indicated her blood glucose was high at 204, her hemoglobin was high at 10.2, and her cholesterol levels were high. (Tr. 950-51.) Dr. Siscu noted her hypertension and mixed hyperlipidemia had suboptimal control with noncompliance, and her diabetes was uncontrolled. (Tr. 951.) He referred Ms. Steele to the ambulatory clinic pharmacy and ophthalmology for diabetes, and referred her to physical therapy for chronic midline low back pain and chronic pain of both shoulders. (*Id.*) She advised Ms. Steele to continue current medications and noted that she needed CPAP supplies. (Tr. 951-52.) Ophthalmologist Gregory Kosunick, O.D. examined Ms. Steele on November 7, 2019, and diagnosed her with type two diabetes without retinopathy and bilateral dry eyes. (Tr. 953.)

Ms. Steele followed up with neurologist Dr. Bambakidis on November 13, 2019 for complaints of numbness/tingling, cramps, and chronic pain. (Tr. 849.) Dr. Bambakidis indicated a recent resurgence of symptoms was possibly related to "intercurrent stress-psychological as well as perhaps physical" causes. (*Id.*) He noted normal examination findings, except that Ms. Steele seemed a bit anxious, ordered a repeat ANA panel and follow-up MRI of the brain, and increased Ms. Steele's dosage of Lyrica. (*Id.*)

Ms. Steele started physical therapy at the Cleveland Clinic on November 14, 2019 for chronic lower back pain. (Tr. 954-57.) She was recommended for four weeks of twice-weekly physical therapy sessions. (Tr. 954.) Her initial evaluation noted some tenderness and limited

range of motion in the lumbar spine and hips, grossly intact sensation, some hypomobile joints, and lower extremity strength ranging from 4/5 to 5/5.  (Tr. 955-56.)  She demonstrated good tolerance for therapy on December 2, 2019, but reported some bad days.  (Tr. 970.)  She tolerated therapy well on December 9, 2019, with improvement in her back pain and core stability, and reported she was walking her dog further than she had previously.  (Tr. 974.)  She exhibited improvements in lumbar range of motion and decreased frequency of pain on December 18, 2019, but continued to be limited in standing, walking and cleaning.  (Tr. 988.)  She demonstrated good tolerance for therapy on January 9, 2020, but continued to report constant low back pain.  (Tr. 1015.)  On January 15, 2020, she reported improvement to back tightness after doing the elliptical and having a shower.  (Tr. 1021.)  On January 22, 2020, she exhibited improvements in walking speed, stair climbing, and hip strength, but continued to be limited with stair negotiation, bending, physical activities, and cleaning.  (Tr. 1027.)  Her physical therapy goals for her back were met on that date, including decreasing her pain rating by two points, standing and walking thirty minutes without pain or symptoms, and sitting for twenty minutes without increased symptoms.  (Tr. 1027.)  It was noted she could shop for one to two hours with a cart.  (*Id.*)

Ms. Steele also initiated physical therapy for her bilateral shoulder pain on November 21, 2019, following a fall in July 2019.  (Tr. 958-61.)  She was recommended for four weeks of once-weekly physical therapy visits.  (Tr. 958.)  Her initial evaluation noted increased thoracic kyphosis, rounded shoulders, some limited range of motion in the shoulders, and shoulder function strength ranging from 4/5 to 4+/5.  (Tr. 959-60.) On December 5, 2019, she showed good tolerance for treatment but had painful cracking with mirror wipes.  (Tr. 972.)  On December 12, 2019, she showed improvement in her active shoulder range of motion and was

10

doing well with home exercises, but continued to have some shoulder weakness.  (Tr. 977.)  Her shoulder strength and active shoulder range of motion were noted to be improved as of January 7, 2020, although she continued to be limited by pain; she reported being independent with dressing, bathing, carrying groceries, and driving.  (Tr. 1011-12.)  By January 21, 2020, she reported that she was able to do more chores, and was able to progress to strength training in her shoulder therapy.  (Tr. 1024-25.)  She demonstrated a good tolerance for therapy, with "pretty good" reach and carry, on January 27, 2020.  (Tr. 1031.)  Her functional strength was noted to include reach up to three pounds, and lift/carry up to ten pounds.  (Tr. 1032.)  Her physical therapy goals of decreasing pain rating by two points, increasing active range of motion of left shoulder by fifteen degrees to allow improved performance of activities of daily living, and performing dressing and grooming without pain were met.  (*Id.*)

Ms. Steele was discontinued from physical therapy for her shoulders and her lower back on February 4, 2020, after eight total therapy sessions, "due to goal achievement and maximal benefit."  (Tr. 1047.)

Ms. Steele attended an initial pharmacotherapy management appointment for diabetes and hypertension on November 27, 2019 with Lindsey Wiegmann, PharmD, BCACP.  (Tr. 962-69.)  Ms. Steele reported nonadherence to pioglitazone due to affordability, but confirmed adherence to the rest of her diabetes regimen and denied symptoms of hypoglycemia.  (Tr. 967.)  Pharmacist Wiegmann stopped alogliptin, started Trulicity, and continued Basaglar, glimepiride, and metformin; she noted that Ms. Steele's hypertension was controlled, and continued her medications for hypertension and dyslipidemia.  (Tr. 968.)  Pharmacist Wiegmann increased her Trulicity at a follow-up pharmacotherapy management appointment on January 6, 2020.  (Tr.

997-98.)  She also agreed to help Ms. Steele to apply for patient assistance to refill her Lyrica

prescription.  (Tr. 992, 998.)

On January 6, 2020, Ms. Steele attended a primary care follow-up appointment with Dr.

Siscu.  (Tr. 999.)  She complained of anxiety and bilateral hand weakness.  (*Id*.)  Her physical

examination findings were normal, her weight was 263 pounds, and her blood pressure was

134/80.  (Tr. 999-1000.)  Dr. Siscu noted good control of hypertension and improved control of

diabetes and diabetic peripheral neuropathy, and continued current medications.  (Tr. 1000.)  Ms.

Steele was referred to an occupational therapist for reported weakness in her hands.  (Tr. 1001.)

Ms. Steele saw cardiologist Kenneth Nelson, D.O., at the Cleveland Clinic Heart and

Vascular Institute on January 7, 2020.  (Tr. 1002.)  She complained of worsening palpations,

chest soreness, and exertional symptoms, including lightheadedness.  (Tr. 1003.)  Dr. Nelson

noted that she was living a sedentary lifestyle, and reported difficulty affording healthy food.

(*Id*.)  She believed that her weight had decreased, but Dr. Nelson noted it was the same as it was

in 2018.  (*Id.*)  Her physical examination was normal, except that her weight was 266 pounds and

her BMI was 48.65.  (Tr. 1004.)  Her ECG findings were normal.  (*Id.*)  Dr. Nelson ordered an

echocardiogram and exercise stress testing, and opined that her dizziness was likely due to blood

sugar abnormalities.  (Tr. 1003-04.)

She returned to Dr. Nelson for a cardiology follow-up on February 4, 2020, where she

continued to complain of palpitations.  (Tr. 1038-46.)  Her physical examination was normal

except an obese abdomen and BMI of 46.41.  (Tr. 1040.)  A January 23, 2020 echocardiogram

showed a small left ventricle with mild concentric left ventricular hypertrophy, normal left

ventricular systolic function, and grade I left ventricular diastolic dysfunction, with no significant

change from the prior exam of July 2018.  (*Id.*).  Her exercise tolerance test on the same date was

abnormal due to a low heart rate recovery, fair functional capacity, and a low chronotropic response.  (Tr. 1040-41.)  Based on her exertional chest discomfort and abnormal stress test, Dr. Nelson recommended a left heart catheterization.  (Tr. 1039.)  Ms. Steele refused the procedure, preferring to improve her fitness.  (*Id.*)  She reported a goal to lose weight prior to her next cardiology visit and was reportedly considering bariatric surgery.  (*Id.*)

At a pharmacotherapy management appointment on February 11, 2020, Pharmacist Wiegmann noted that Ms. Steele's last A1c was 7.8, still above her goal of below 7, but greatly improved from 10.2.  (Tr. 1058.)  He increased metformin, continued her other medications, and discussed lifestyle recommendations.  (*Id.*)

At a primary care appointment with Dr. Siscu on March 10, 2020, Ms. Steele complained of chronic left shoulder pain and right carpal tunnel syndrome.  (Tr. 1166, 1394.)  Her physical examination findings were normal, except for tenderness to palpation on the right shoulder and left hand.  (Tr. 1166, 1395.)  Dr. Siscu noted her diabetes and diabetic peripheral neuropathy showed improved control, her hypertension was under fair control, and her mixed hyperlipidemia was under good control.  (Tr. 1167, 1396-97.)  He referred her to orthopedics for right carpal tunnel syndrome and chronic left shoulder pain.  (*Id.*)

Ms. Steele had a telephonic follow-up with pharmacist Wiegmann on May 5, 2020, where she reported that her blood glucose was fluctuating and she had continued chest discomfort and nerve pain all over her body.  (Tr. 1407.)  She had restarted Lyrica 100 mg daily, but could not take more without upsetting her stomach.  (*Id.*)  Her blood glucose had improved since being able to afford all of the medications.  (Tr. 1408.)  She was continued on her same medications and encouraged to monitor her blood glucose twice daily.  (*Id.*)

Ms. Steele also had a telephone follow-up with neurologist Dr. Bambakidis on May 5, 2020, complaining of numbness, tingling, and spasms.  (Tr. 1386.)  She reported that her increased Lyrica dosage had been beneficial, but she had difficulty tolerating it because of gastrointestinal difficulties.  (*Id.*)  Dr. Bambakidis initiated treatment with baclofen.  (*Id.*).

Ms. Steele had a virtual appointment with NP Bartley at the Heart and Vascular Institute on May 12, 2020.  (Tr. 1412-24.)  She complained of continued exertional chest pressure and shortness of breath, with discomfort for several hours every day, worse with activities/exertion.  (Tr. 1413.)  NP Bartley recommended cardiac catheterization as soon as possible, but Ms. Steele preferred to wait until the fall.  (Tr. 1413-14.)

Ms. Steele followed up with neurologist Dr. Bambakidis on August 11, 2020 for numbness, tingling, and chronic pain.  (Tr. 1478.)  She complained of sharp shooting pains in her chest and chest pain with inspiration, and reported no underlying etiology has been forthcoming when mentioned to other providers.  (*Id.*)  She also reported the increased dose of baclofen was causing sedation, and she may have recently fallen asleep while driving.  (*Id.*)  Her physical examination was normal, except that at least a mildly increased amount of muscle tension was noted in the cervical paraspinal and trapezius musculature bilaterally.  (*Id.*)  Dr. Bambakidis indicated Ms. Steele's symptoms were suboptimally controlled, and recommended increasing her dosage of baclofen.  (*Id.*)  He also noted her history of OSA and reported inability to tolerate a CPAP, and encouraged her to follow up with a sleep specialist.  (*Id.*)

Ms. Steele underwent a pre-operative cardiovascular assessment with Maran Thamilarasan, M.D., on August 18, 2020 in preparation for the excision of a left breast mass.  (Tr. 1479.)  Her physical examination results were normal, with a BMI of 46.07.  (Tr. 1485.)  Dr. Thamilarasan noted she had risk factors for coronary artery disease, and felt it was reasonable to

proceed with a catheterization to define her anatomy and intervene if necessary.  (Tr. 1485-86.)
An echocardiogram on August 26, 2020 with normal results.  (Tr. 1529-31.)  A diagnostic
cardiac catheterization on the same day had normal findings except for mild pulmonary arterial
hypertension.  (Tr. 1533-35.)  Ms. Steele was able to proceed with breast surgery with no further
cardiac testing.  (Tr. 1535.)

On August 31, 2020, Ms. Steele saw Songcerae Washington, PA-C, at the Cleveland
Clinic Respiratory Institute for complaints of shortness of breath, dyspnea on exertion, wheezing,
and cough.  (Tr. 1501.)  It had been almost two years since her last pulmonology visit.  (*Id*.)  She
reported she had not used her CPAP in a year because the facemask cracked, and she was unable
to replace it due to insurance and financial constraints; she admitted to gasping at night and not
feeling rested in the morning, but had not scheduled a follow up appointment with Dr. Walia.
(*Id*.)  Physical examination results were normal.  (Tr. 1506.)  PA Washington described her
dyspnea on exertion as multifactorial, including deconditioning and obesity, and noted that she
had untreated/uncontrolled OSA.  (Tr. 1507.)  She advised Ms. Steele to use her albuterol inhaler
prior to activity and follow up with sleep specialist Dr. Walia, and encouraged weight loss.  (*Id*.)

Ms. Steele followed up with Dr. Walia at the Cleveland Clinic Sleep Disorders Center on
September 4, 2020. (Tr. 1518.)  She reported she had not used the CPAP machine for years, with
one main barrier being that the pressure felt very uncomfortable, and also because the mask was
broken.  (*Id*.)  She reported she slept sitting up due to coughing and back pain, woke up multiple
times per night, and took a one- to two-hour nap daily.  (Tr. 1519.)  Examination results were
normal, including good range of motion in her extremities, with a BMI of 47.19.  (Tr. 1522.)  Dr.
Walia ordered a polysomnogram to reassess for obstructive sleep apnea.  (Tr. 1523.)

Ms. Steele returned to pain management specialist Dr. Abraham on September 17, 2020, complaining of pain in her joints, bones, and feet.  (Tr. 1542.)  Physical examination findings were normal, except pain to palpation of the lumbar paraspinal muscles, positive facet loading, a loss of light touch and temperature sensation in a glove and stocking pattern, an antalgic gait, and a BMI of 47.55.  (Tr. 1543.)  Her listed diagnoses included well controlled type two diabetes with neuropathy and myalgia.  (Tr. 1544.)  Dr. Abraham noted that she was having some benefit with Cymbalta and her hemoglobin A1c had decreased from 8.1 to 7.3, so he increased her Cymbalta dosage.  (*Id.*)  He continued her prescriptions for Lyrica and baclofen.  (*Id.*)

Ms. Steele attended a diabetes follow-up appointment with Beth Gunselman, APRN, CNP, on September 22, 2020.  (Tr. 1549-52.)  Lab results from August 2020 reflected that her blood glucose was high at 162 and her hemoglobin A1c was high at 7.3.  (Tr. 1549-50.)  On examination, she had no edema and her feet had normal distal pulses, sensitive to 10 gm monofilament and pes planus.  (Tr. 1551.)  CNP Gunselman noted her hypertension showed good control and her diabetes was stable with improved control, and continued her medications. (*Id.*)  She referred Ms. Steele to podiatry for complaints of foot pain.  (*Id.*)

Ms. Steele underwent another pre-operative evaluation at Cleveland Clinic on September 23, 2020.  (Tr. 1579.)  Examination results were normal, and Amarendhar Gopireddy, M.D., opined she was "optimally prepared for surgery."  (Tr. 1585-86.)  Ms. Steele's breast lesion was surgically excised on September 30, 2020.  (Tr. 1604.)

On October 13, 2020, Ms. Steele was seen by Thuan Pham of the Cleveland Clinic for pain in her heels that had lasted about two months.  (Tr. 1615.)  Ms. Steele's lower extremity examination was normal, except for pain to palpation on the posterior aspect of both heels, right greater than left, and a decreased arch on both feet.  (Tr. 1617.)  Her range of motion, strength,

and sensation was normal as to both feet. (*Id.*) Dr. Pham assessed her with type two diabetes and insertional Achilles tendinitis of both feet, educated her on diabetic foot care, and referred her for physical therapy for Achilles tendinitis, with a follow-up appointment to be scheduled in three to four weeks. (Tr. 1617.)

### 2. Opinion Evidence

#### i. Function Reports

In an October 2019 Function Report, Ms. Steele reported living alone with a dog for companionship. (Tr. 316.) She was sometimes unable to dress, bathe, or grab utensils. (*Id.*) She stated she had trouble focusing for more than ten minutes, even to complete the form. (Tr. 319, 320.) She stated she was able to lift less than ten pounds and walk twenty to thirty feet at a time. (Tr. 320.) Ms. Steele also reported limitations in nearly every functional area, including her ability to talk, hear, sit, kneel, use her hands, squat, bend, stand, and reach due to pain and neuropathy throughout her body. (Tr. 311, 316-22.) She reported she was able to care for her pet dog, prepare simple meals, perform light housework, drive a car, shop in stores, manage finances, and visit with friends and family. (Tr. 316-19.)

#### ii. State Agency Reviewers

On November 22, 2019, state agency reviewing physician Anton Frihofner, M.D., reviewed the record and opined that Ms. Steele had the following physical functional limitations:

- lift and carry up to twenty pounds occasionally and ten pounds frequently;

- stand/walk for about six hours total in a normal eight-hour workday;

- sit for about six hours total in a typical workday;

- perform all postural activities (aside from climbing ladders, ropes, or scaffolds) occasionally;

- perform frequent handling and fingering bilaterally; and

- must avoid concentrated exposure to workplace hazards.

(Tr. 127-28.)  Dr. Freihofner explained he based his opinion on objective clinical findings about Ms. Steele's normal gait, intact strength and coordination, negative straight leg raise testing, full range of motion, and lack of atrophy and edema.  (Tr. 124.)  On April 12, 2020, state agency reviewing physician Linda Hall, M.D., reviewed the record and concurred with the opinion of Dr. Frihofner.  (Tr. 146-48.)

**C.**    **Hearing Testimony**

**1.**    **Plaintiff's Testimony**

At the October 15, 2020 hearing, Ms. Steele testified that that she stopped working due to severe neuropathy pain in her extremities and chest, dizziness, and back pain.  (Tr. 85-86.)  Basic household activities left her in "chronic pain afterwards to the point of tears."  (Tr. 87.)  Physical therapy had been helpful, and she tried to keep up with the exercises she learned, but pain made that unbearable most times.  (Tr. 87.)  She had tried pain medications, including baclofen and Lyrica, but they left her unable to function and she was sleeping through the day.  (Tr. 88.)  She also feared becoming addicted, so she cut back.  (*Id.*)

She testified that her diabetes caused neuropathy in her chest and extremities, which most affected her right hand and arm.  (Tr. 90.)  Her feet were numb and cold, and putting on shoes was sometimes painful.  (*Id.*)  She could stand for only ten minutes due to pain, weakness, and poor balance, and could walk for only five to ten minutes.  (Tr. 91-92.)  She could no longer fasten buttons or test her blood sugar with her right hand, and reaching overhead was painful.  (Tr. 92.)  She was no longer driving because she lost her insurance, but neuropathy symptoms made it hard to shift gears or use the pedal when she did drive.  (Tr. 93.)  She lost consciousness

while driving a couple of times.  (*Id*.)  She testified that her last fall was less than a month before, when she fell in the shower.  (Tr. 93.)

She had worked from February 28 to March 19, 2020 as a bus assistant, helping handicapped students on and off the bus, for up to sixteen hours a week.  (Tr. 85-86.)  She had to leave that job because of severe dizziness, pain, and fatigue.  (Tr. 86.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Ms. Steele's age, education, and work experience, who had the functional limitations described in the ALJ's RFC determination could not perform Ms. Steele's past work, but could perform representative positions in the national economy, including mail clerk, inspector/hand packager, and electronics worker.  (Tr. 96-97.)  If the individual was further limited to handling occasionally with the dominant right upper extremity, the individual could also perform representative positions in the national economy.  (Tr. 97-98.)   If the individual was further limited to standing and walking up to four hours in an eight-hour workday, the individual could still perform some representative positions.  (Tr. 99-100.)  However, if the individual was limited to occasional reaching, pushing, and pulling bilaterally, that would preclude competitive employment.  (Tr. 99.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

**IV. The ALJ's Decision**

20

In his December 9, 2020 decision, the ALJ made the following findings:[1]

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.  (Tr. 54.)

2.  The claimant has not engaged in substantial gainful activity since July 24, 2018, the alleged onset date.  (*Id.*)

3.  The claimant has the following severe impairments: diabetes mellitus type II, diabetic neuropathy, carpal tunnel syndrome, obesity, migraine headaches, ischemic colitis, asthma, lumbar facet degenerative change, depression, and anxiety.  (*Id.*)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 55.)

5.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she can occasionally climb ramps and stairs, cannot climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, or crawl. The claimant must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and must avoid all exposure to hazards meaning unprotected heights and work around hazardous moving machinery. She can perform frequent handling and fingering bilaterally. The claimant can understand and remember simple and moderately complex instructions and carry out simple and moderately complex tasks with no strict production or strict pace requirements. She is capable of brief, superficial interactions with others and should not be subjected to over-the-shoulder supervision. She can adapt to a setting where pressures are routine and predictable and any major changes should be easily explained or demonstrated. Superficial means the jobs duties cannot require arbitration, negotiation, or conflict resolution, management or supervision of others, or being responsible for the health, safety, or welfare of others.  (Tr. 59-60.)

6.  The claimant is unable to perform any past relevant work.  (Tr. 68.)

7.  The claimant was born in 1968 and was 50 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date.  (Tr. 69.)

8.  The claimant has at least a high school education.  (*Id.*)

---

[1] The ALJ's findings are summarized.

9. Transferability of job skills is not material to the determination of disability.  (*Id*.)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including [JOBS].  (Tr. )

Based on the foregoing, the ALJ determined that Ms. Steele had not been under a disability, as defined in the Social Security Act, from July 24, 2018, through the date of the decision on December 9, 2020.  (Tr. 71.)

## V.  Plaintiff's Arguments

In her Brief, Ms. Steele raises two assignments of error:

1. The ALJ's finding that Ms. Steele can perform the standing and walking required in light work is not supported by substantial evidence.  (ECF Doc. 16 pp. 1, 14.)

2. The ALJ failed to fully evaluate Ms. Steele's upper extremity limitations, resulting in a legally insufficient RFC determination.  (*Id*. at pp. 1, 18.)

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: Whether ALJ's Finding That Ms. Steele Can Perform Light Work Was Supported by Substantial Evidence**

Ms. Steele asserts that the ALJ "failed to accurately consider and evaluate all of the relevant evidence regarding [her] limited ability to stand and walk, including the findings of treating and examining physicians and Ms. Steele's physical therapist."  (ECF Doc. 16, p. 14.) She further argues that his analysis of her treatment records "was selective and failed to address the substantial abnormal clinical and objective findings and medical opinions which establish Ms. Steele's limited ability to stand and walk."  (*Id.*)  Accordingly, she argues the ALJ's finding that she had the RFC to engage in light work was not supported by substantial evidence.  (*Id.*) The Commissioner responds that the ALJ properly identified "persuasive State agency reviewing physicians' findings and the mountain of unremarkable objective clinical findings" as substantial evidence supporting his RFC determination.  (ECF Doc. 18, pp. 9-10.)

In support of this assignment of error, Ms. Steel asserts that the ALJ: (1) "did not accurately consider all of the objective findings which demonstrated [her] difficulty with standing and walking"; (2) "failed to fully address the impact of Ms. Steele's pain and symptoms"; (3) failed to analyze an "opinion regarding the suboptimal control of Ms. Steele's symptoms"; and (4) failed to analyze physical therapy findings.  (ECF Doc. 16, p. 17.)  Each argument will be addressed in turn.

**1.     Whether ALJ Appropriately Considered Objective Findings**

In support of her argument that the ALJ failed to address "substantial abnormal clinical and objective findings" showing she could not perform light work, Ms. Steel highlights objective findings in her treatment records noting an antalgic or impaired gait, pain to palpation, and loss of sensation.  (ECF Doc. 16, pp. 15-16 (citing Tr. 424, 448-49, 1543).)  The records include a January 2019 pain management visit (Tr. 448-49 (exam showing pain to palpation of lumbar

24

paraspinals, positive facet loading, antalgic gait, loss of sensation)), an August 2019 ER visit for a fall (Tr. 423-24 (notation of impaired gait)), and a September 2020 pain management visit (Tr. 1542-43 (exam showing pain to palpation of lumbar paraspinals, positive facet loading, loss of sensation to light touch and temperature in glove and stocking pattern)).

As an initial matter, it is observed that an ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) (noting a "failure to discuss . . . observations does not indicate that they were not considered" and "[a]n ALJ need not discuss every piece of evidence in the record for his decision to stand.").

Here, a review of the ALJ decision reveals that he acknowledged Ms. Steele "showed some pain to palpation of the lumbar paraspinal muscles, positive facet loading, antalgic gait, and some loss of sensation."  (Tr. 63 (citing Tr. 449 (Jan. 2019 pain management visit), 794 (Nov. 2019 primary care visit for frequent falls).)  Later, in discussing her treatment with pain management, he acknowledged Ms. Steele "showed pain to palpation over lumbar paraspinal muscles and positive facet loading bilaterally but no pain to palpation over the PCIS," her "[g]ait was antalgic," and "[n]eurological exam showed bilateral upper and lower extremity coordination intact, muscle reflexes symmetric, but positive loss of sensation to light touch." (Tr. 65 (citing Tr. 1543 (9/20 pain management visit), 1645 (same).)  In so finding, the ALJ cited the same physical examination findings highlighted by Ms. Steele.  And while he did not specifically discuss the additional notation "has impaired gait" from Ms. Steele's August 2019

25

emergency room records, he did discuss the actual physical examination findings from that visit accurately and in detail.  (Tr. 62 (citing Tr. 427, 429-31).)

In addition to acknowledging the abnormal physical examination findings highlighted in Ms. Steele's brief, the ALJ also described Ms. Steele's medical records in significant detail, including the many normal physical examination findings in her treatment records.  (Tr. 61-66.) Based on that detailed discussion, the ALJ went on to conclude:

> [T]he objective evidence failed to support the claimant's alleged limitations. In particular, the medical record does not establish functional limitations that would preclude the light exertional level with postural, manipulative, and environmental limitations. The claimant has continued with a conservative course of treatment for physical and mental health conditions. She has required no extended inpatient stays, emergent care requiring extensive intervention and/or admission, or invasive surgeries or procedures for exacerbations of physical or mental health symptoms. Emergency department visits resulted in same-day or next-day discharge in improved and stable condition and instruction to continue with a conservative course of treatment. The claimant's ongoing treatment plan has included routine office visits, medication management, physical therapy, testing, monitoring, and instruction on diet and exercise. In addition, the objective evidence demonstrated gaps in treatment, for example, with pulmonary and pain management specialists.
>
> Further, progress notes from office visits generally indicated stability, and examinations showed intact functioning despite her conditions. The claimant routinely presented as alert, oriented, and cooperative, well developed, and well nourished. She maintained regular heart rate and rhythm, normal S1 and S2, lungs clear to auscultation, no wheeze, rhonchi, or rales, and intact cranial nerves and neurologic functioning. At times, she noted to have musculoskeletal tenderness or discomfort, pain to palpation, and antalgic gait, but otherwise showed normal strength, no joint swelling, normal movement of all extremities, intact coordination, and normal gait and no assistive device.

(Tr. 66 (citations omitted).)

The ALJ's thorough discussion of the record, including acknowledging the abnormal findings highlighted in Ms. Steele's brief, demonstrates that he considered the evidence as a whole and reached a reasoned conclusion.  Ms. Steele has not established that the ALJ failed to consider the objective findings or failed to provide sufficient insight into his basis for concluding that Ms. Steele could perform light work.

26

## 2.     Whether ALJ Failed to Address Impact of Pain and Symptoms

Ms. Steele argues that the medical evidence establishes her pain and symptomology are inconsistent with light work activity.  (ECF Doc. 16, p. 14.)  In arguing the ALJ failed to fully address the impact of her pain and symptoms, Ms. Steele highlights the following complaints:

- dyspnea on exertion (*id.* at p. 15 (citing Tr. 475, 479);

- two falls in one day (*id.* (citing Tr. 423, 427));

- muscle cramping (*id.* (citing Tr. 663));

- numbness, tingling, cramps, chronic pain (*id.* at 15-16 (citing Tr. 849, 1478));

- low back pain, worse with sitting and radiating to the lower extremities (*id.* at p. 16 (citing Tr. 954-55, 1015, 1032));

- limitations in standing, walking, and cleaning (*id.* (citing Tr. 988));

- chest discomfort and palpitations (*id.* (citing Tr. 1003-04));

- foot pain (*id.* (citing Tr. 1617); and

- pain through her extremities, weakness, and poor balance (*id.* (citing Tr. 90-92)).

However, "an ALJ is not required to accept a claimant's subjective complaints."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  Instead, an ALJ must use a two-step process to evaluate symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49463.  First, he must determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  Second, he must evaluate the intensity and persistence of those symptoms to determine the extent to which they limit the individual's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.

Here, Ms. Steele acknowledges that the ALJ followed the first step by finding her medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (ECF Doc. 16, p. 17 (citing Tr. 60).)  Specifically, the ALJ explained:

> The claimant alleged disability due to diabetes mellitus type II, neuropathy, sleep apnea, asthma, aorta and mitral valve regurgitation, lung nodule, GI bleed, spleen nodule, neurological problems, and hernia. She alleged worsening of all conditions, fatigue, vision changes, and high sugars around the fall of 2019. The claimant reported conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. She described difficulty performing daily activities due to physical and mental limitations, in particular, problems managing personal care, including dressing and bathing, does only light housework and deep cleaning as needed, and can only walk approximately 20 to 30 feet before needing to stop and rest. . . .

(Tr. 60-61 (citations omitted).)  Nevertheless, the ALJ concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 61.)  In particular, the ALJ found Ms. Steele's statements about the intensity, persistence and limiting effects of her symptoms were "inconsistent because the objective evidence failed to substantiate the alleged degree of limitations."  (*Id*.)

Ultimately, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements" with the record evidence, and an ALJ's findings in this regard must be afforded deference if they are supported by substantial evidence.  *Lipanye v. Comm'r of Soc. Sec*., 802 F. App'x 165, 171 (6th Cir. 2020).  This Court must therefore consider whether the ALJ's decision was supported by substantial evidence when he concluded that Ms. Steele's reported symptoms were not wholly consistent with the objective evidence of record.

29

With respect to Ms. Steele's claims of dyspnea on exertion, chest discomfort, and palpitations, the ALJ discussed a cardiology visit where she raised these complaints.  (Tr. 64.)  He outlined her normal cardiac examination findings, but acknowledged that her "recommended treatment plan included a left heart catheterization due to exertional chest discomfort and an abnormal stress test."  (*Id.* (citing Tr. 816-1060).)  He noted that she declined the recommended procedure during visits in February and May 2020 (*id.* (citing Tr. 1413-14)), and that the eventual results of the procedure were normal except for mild pulmonary arterial hypertension (Tr. 65 (citing Tr. 1507, 1533-37)).  The ALJ also noted that a pulmonary appointment for shortness of breath in August 2020 was her first since 2018, that her examination and pulmonary function test were unremarkable, and that her treatment plan included use of her inhaler, follow-up regarding her CPAP machine, and weight loss.  (*Id.* (citing Tr. 1501, 1506-07).)

The ALJ also discussed medical findings relating to Ms. Steele's complaints of muscle cramping, foot and extremity pain, numbness, tingling, weakness, falls, and limitations in standing and walking.  He discussed an emergency room visit for a fall, noting her full range of motion in all extremities, weight bearing without difficulty, and discharge with instructions to take Tylenol for aches and pains.  (Tr. 62 (citing Tr. 427, 429, 431).)  He also discussed an emergency room visit with complaints of lightheadedness, chest pains, and diffuse muscle cramping where providers noted normal examination findings, including intact sensation and strength and edema, and a normal EKG, but drained an abscess without complications.  (*Id.* (citing Tr. 662, 665-66.)  He noted that her complaints of numbness and tingling in her right hand were borne out by EMG testing showing moderate carpal tunnel syndrome.  (Tr. 63 (citing Tr. 474).)  As to her treatment for diabetes and diabetic neuropathy, he noted that exams showed no or trace edema, normal extremity strength, full range of motion, and stable joints, but some

findings of antalgic gait and loss of sensation, with a treatment plan that included medication, monitoring, diet, and exercise.  (*Id.* (citing Tr. 440-647, 766-787, 1361, 1370).)  He noted that she treated with baclofen and Lyrica for numbness, tingling, spasms, and pain.  (Tr. 64-65 (citing Tr. 1386, 1471, 1478).)  He also noted that her treatment with pain management was infrequent, with limited abnormal physical exam findings, and treatment with medication with some benefit.  (Tr. 65 (citing Tr. 1542-44, 1644-45).)  When Ms. Steele complained of foot pain, he noted that her exam showed normal distal pulses, sensitive to 10 gm monofilament, and pes planus.  (Tr. 66 (citing Tr. 1551, 1643).)  He found that her foot impairments were non-severe impairments, a finding that was not challenged on appeal.  (Tr. 55.)

With regard to Ms. Steele's low back pain, the ALJ noted her normal examination findings and mild lumbar x-ray findings following a motor vehicle accident, resulting in a diagnosis of lumbar strain and a prescription for Naprosyn and Flexeril.  (Tr. 61-62 (citing Tr. 391-439).)  He also noted her examination findings of pain to palpation of the lumbar paraspinal muscles, positive facet loading, and antalgic gait during infrequent pain management treatment visits, with other examination findings being normal.  (Tr. 63, 65 (citing Tr. 449, 794, 1543, 1645).)  He acknowledged that she completed eight physical therapy visits over a four-month period of time, with "goal achievement and maximal benefit" (Tr. 64 (citing Tr. 1047)), and treated her pain with medication with some benefit (Tr. 65 (citing Tr. 1544, 1646)).

After a detailed review of the objective evidence, the ALJ concluded that the medical record did not establish functional limitations that would preclude light work.  (Tr. 66.)  He emphasized that her emergency care did not require extensive intervention, that her ongoing treatment plan was relatively routine, that the objective evidence demonstrated gaps in treatment,

and that "progress notes from office visits generally indicated stability, and examinations showed intact functioning despite her conditions."  (*Id.* (internal citations to the record omitted).)

Having reviewed the decision as a whole, the Court finds the ALJ's conclusion that Ms. Steele's statements about the intensity, persistence and limiting effects of her symptoms were "inconsistent because the objective evidence failed to substantiate the alleged degree of limitations" was supported by substantial evidence, and is therefore entitled to deference.  Ms. Steele has failed to demonstrate on appeal that the ALJ failed to fully address her symptoms.

### 3.    Whether ALJ Failed to Analyze a Medical Opinion

Ms. Steele also argues the ALJ failed to properly analyze a medical opinion "regarding the suboptimal control of Ms. Steele's symptoms."  (ECF Doc. 16, p. 17.)  Here, she is referring to notes from an August 2020 neurology office visit with Dr. Bambakidis where she complained of numbness, tingling, chronic pain and shooting chest pains.  (Tr. 1478.)  Although Ms. Steele's examination findings were largely normal, Dr. Bambakidis noted "her symptoms are suboptimally controlled" and increased her baclofen.  (*Id.*)  Ms. Steele argues the ALJ's failure to address this note regarding suboptimal control of symptoms "proves that the record has not been evaluated as a whole and that medical source opinions were not adequately considered." (ECF Doc. 16, pp. 17-18.)

Under the applicable regulations, "[a] medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, and other demands of work activities or to adapt to environmental conditions.  20 C.F.R. § 404.1513(a)(2).

A doctor's comment that symptom control is suboptimal is neither a statement of what Ms. Steele can do despite her impairments nor a statement as to whether she has specific work-related or environmental limitations.  Thus, Dr. Bambakidis' comment was not a medical opinion and the ALJ was not required to analyze it as if it was.  The Court additionally notes that the ALJ did appropriately consider Dr. Bambakidis' records and objective findings in support of his RFC finding.  (*See, e.g.*, Tr. 63 (citing Tr. 459), 64 (citing Tr. 1386), 65 (citing Tr. 1478).)  Ms. Steele has therefore failed to demonstrate that the ALJ erred in his discussion of these records.

### 4.    Whether ALJ Improperly Failed to Address Physical Therapy Records

Ms. Steele additionally argues that the ALJ erred by failing to analyze her "physical therapy findings" as medical opinions.  (ECF Doc. 16, pp. 17-18.)  Specifically, she refers to a physical therapy "discontinuance of care" document stating she met certain treatment goals upon the completion of eight physical therapy sessions taking place between November 2019 and February 2020.  (*Id.* (citing Tr. 1047).)  The goals that were reportedly met included: "Stand / Walk 30 min without pain/symptoms" and "Patient will be able to tolerate sitting for 20 min without increased symptoms."  (*Id.*)  Apparently, Ms. Steel is arguing that her success in being able to meet those goals should be construed as a medical opinion finding the reverse, that she is not able to sit, stand, and walk for any longer than the time periods set forth in those goals.

However, the Commissioner accurately argues "there is nothing in the record to support [Ms. Steele]'s belief that her physical therapy goals . . . somehow constituted her physical therapist's assessment of the maximum of what she could do" under 20 C.F.R. § 404.1545(a). (ECF Doc. 18, p. 18.)  Instead, the record reflects that Ms. Steele was referred to physical therapy for back pain after x-rays revealed mild degenerative changes, took four months to complete eight therapy sessions, and was discharged after showing improvement and meeting

her goals.  While these findings could be considered in determining the <u>least</u> she can sit, stand, or walk, this document cannot be appropriately construed as an opinion as to the <u>most</u> she can do. The ALJ was not required to discuss the physical therapy records as medical opinions.

For all of the reasons stated above, the Court finds that Ms. Steel has failed to demonstrate that the ALJ lacked substantial evidence to support his finding that Ms. Steele could perform light work.  He considered the evidence as a whole – including the objective findings and Ms. Steele's subjective complaints – and reached a reasoned conclusion as to the appropriate level of limitation.  He also considered and discussed the only opinion evidence of record relating to Ms. Steele's physical impairments, the opinions of the State agency medical consultants who found based on the record that Ms. Steele would be capable of performing light exertional work subject to certain additional limitations.  (Tr. 67.)

It is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, and this Court cannot overturn the Commissioner's decision "so long as substantial evidence … supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  As recently explained by the Sixth Circuit:

> [A]t issue in social security cases is not whether [the court] would have reached the same decision on [the] record.  When determining whether to affirm the Commissioner's decision, [the court] need not "agree with the Commissioner's finding"; [the court] instead ask[s] whether the decision followed legal standards and "is substantially supported in the record."

*Bowers, v. Comm'r of Soc. Sec.*, No. 21-4069, 2022 WL 1277703, at *1 (6th Cir. Apr. 29, 2022) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)).)

While the evidence highlighted by Ms. Steele may support additional limitations, it does not go so far as to establish that the ALJ's contrary finding lacked the support of substantial evidence.  In reviewing the evidence highlighted by Ms. Steele, the Court finds no basis upon

which to conclude that the ALJ's decision regarding Ms. Steele's ability to stand and walk

lacked the support of substantial evidence.  The first assignment of error is without merit.

## C.    Second Assignment of Error: Whether ALJ's Assessment of Upper Extremity Limitations Was Supported by Substantial Evidence

In her second assignment of error, Ms. Steele argues the ALJ "erred in finding that Ms.

Steele can frequently handle and finger bilaterally and in failing to address or recognize any

restrictions in reaching, pushing and pulling."  (ECF Doc. 16 p. 18.)  Specifically, she argues the

ALJ "considered only selective portions of the record, and did not address the objective evidence

as a whole," thus "cherry-picking" the records and ignoring "persuasive evidence of more

significant upper extremity and manipulative limitations."  (*Id.*, at pp. 19, 21.)  The

Commissioner responds that this argument "ignores that [Ms. Steele] repeatedly displayed full

strength, normal range of motion, and no evidence of swelling or atrophy in her upper

extremities throughout her treatment visits," and also ignores the ALJ's observation that "scans

failed to detect any noteworthy abnormalities in Plaintiff's left shoulder, cervical spine, or

lumbar spine."  (ECF Doc. 18, p. 11 (citing records).)

It is generally recognized that an ALJ may not cherry-pick facts to support a finding of

non-disability while ignoring evidence that points to a disability finding. *See, e.g., Gentry v.*

*Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where ALJ failed "to address certain

portions of the record, including the evidence of a continuing illness that was not resolved

despite use of increasingly serious and dangerous medications"); *Minor v. Comm'r*, 513 F.

App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the

record" rather than doing a proper analysis).  Yet, "the ALJ does not 'cherry pick' the evidence

merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v.*

*Astrue*, No. 1:10–cv–1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011).  The Sixth

Circuit has explained that allegations of cherry-picking evidence are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (citing *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009) (finding "little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.")).

In support of her argument that the ALJ selectively parsed the evidence relating to her upper extremity limitations, Ms. Steele highlights her complaints to providers regarding pain, numbness, tingling, and limitations, her treatment for carpal tunnel syndrome with injections and a splint in 2018, her emergency room visit for falls in August 2019, her physical therapy for shoulder pain in 2019, a March 2020 physical examination positive for tenderness of the right shoulder and left hand, and an August 2020 examination noting at least mildly increased muscle tension in her cervical and trapezius musculature.  (ECF Doc. 16, pp. 19-21.)

However, a review of the ALJ decision reveals that the ALJ did address these issues in his analysis.  He discussed her complaints of carpal tunnel syndrome, noting that the diagnosis was supported by EMG testing, that injections were an effective but short-term treatment, and that symptoms included numbness, tingling, and difficulty with pincer strength.  (Tr. 63.)  He discussed her August 2019 emergency room visit for shoulder and chest pain after a fall, noting her normal examination findings, except mild left shoulder tenderness, and her same-day discharge with instructions to treat with Tylenol.  (Tr. 62.)  With respect to her 2020 treatment and physical therapy, the ALJ stated:

> The claimant presented for follow-up with her primary care provider in 2020 and described chronic left shoulder pain and carpal tunnel syndrome. Physical examination indicated she was alert and in no acute distress with regular heart rate and rhythm normal S1 and S2, lungs clear to auscultation, no wheezing or rhonchi, and non-tender abdomen. She showed full range of motion in all extremities and no edema. Examination indicated tenderness on palpation anterior right shoulder and

left hand. The claimant's treatment plan included to continue current medications, regular aerobic exercise, diet, and weight loss. She also received referral to orthopedics for carpal tunnel syndrome and left shoulder pain. Progress notes from discontinued physical therapy in February 2020 after attending for eight visits starting in November 2019 indicated goal achievement and maximal benefit.

(Tr. 63-64 (citations omitted).)  He then noted her complaints of numbness, tingling, and spasms in both hands, treated with Lyrica and baclofen in May 2020.  (Tr. 64.)  Finally, he discussed her subsequent treatment with neurology, as follows:

During a neurology follow-up visit in August 2020, the claimant described numbness, tingling, and chronic pain, and experienced difficulty tolerating increased dose of baclofen due to sedation. Examination indicated she was alert, pleasant, cooperative, and coherent. She showed intact cranial nerves, well preserved motor strength, no tendon reflex asymmetry, and mildly increased amount of muscle tension in the cervical paraspinal and trapezius musculature bilaterally.

(Tr. 65 (citations omitted).)

In addition to discussing the complaints, abnormal findings, and treatment modalities highlighted in Ms. Steele's brief, the ALJ also observed throughout the decision that physical examination findings relating to Ms. Steele's upper extremities were largely normal:

- "The claimant maintained normal, 5/5, and symmetric bilateral upper and lower extremity strength with no atrophy or tone abnormalities noted. She also had a full range of motion of all extremities. Joints were stable." (Tr. 63 (citations omitted));

- "She showed intact coordination of bilateral upper and lower extremities" (*id;* (citations omitted));

- "She showed full range of motion in all extremities and no edema."  (Tr. 64 (citations omitted));

- ". . . no peripheral edema, and normal extremities." (*Id.* (citations omitted));

- ("She showed bilateral upper and lower extremity strength normal and symmetric with no atrophy or tone abnormalities" and "no pain to palpation over the cervical paraspinal muscles," with "bilateral upper and lower extremity coordination intact, muscle stretch reflexes symmetric, but positive loss of sensation to light touch." (Tr. 65 (citations omitted)).

In finding that the objective evidence did not support the level of limitation alleged by Ms. Steele, the ALJ observed that she had continued a conservative course of treatment, with no extended inpatient stays, extensive interventions, or invasive surgeries, that progress notes from her office visits generally indicated stability, and that examinations showed intact functioning. (Tr. 66.)  The ALJ acknowledged "[a]t times she [was] noted to have musculoskeletal tenderness or discomfort, pain to palpation, and antalgic gait, but otherwise showed normal strength, no joint swelling, normal movement of all extremities, intact coordination, and normal gait and no assistive device."  (*Id.*)

A review of the decision as a whole shows that the ALJ did not ignore evidence relating to Ms. Steele's upper extremity limitations, but instead "consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion."  *Boseley*, 397 F. App'x at 199.  After reviewing the entire record, the ALJ followed the recommendation of the State agency medical consultants to limit Ms. Steele to frequent handling and fingering with her bilateral upper extremities.  (Tr. 59-67.)

In arguing that the ALJ should have adopted additional limitations, Ms. Steele is asking this Court to reweigh the evidence on appeal, which it may not do.  The standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406.  That means this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ," regardless of whether substantial evidence – or even a preponderance of evidence – supports Ms. Steele's contrary reading of the evidence.  *Jones*, 336 F.3d at 477.

With respect to Ms. Steele's argument that the ALJ specifically erred by failing to account for her shoulder pain in the RFC, the Court additionally notes that the ALJ did not identify a medically determinable impairment ("MDI") relating to her shoulder, a finding which

was not challenged on appeal.  An MDI is an impairment that results from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques," and which "must be established by objective medical evidence from an acceptable medical source."  20 C.F.R. § 404.1521.  Ms. Steele's shoulder imagery was negative (Tr. 430), and the Court is not aware of a diagnosed shoulder impairment in the record; "shoulder pain" is a symptom, not a diagnosis.  While an ALJ must consider all known MDIs in assessing an individual's RFC limitations, *see* 20 C.F.R. § 1545(a)(2), (e), he need not consider the impact of non-medically determinable impairments.  *See Barnes v. Comm'r of Soc. Sec.*, No. 16-13714, 2018 WL 1474693, at *7 (E.D. Mich. Mar. 6, 2018) ("There is no error in failing to consider non-medically determinable impairments throughout the sequential analysis.") (citations omitted), *report and recommendation adopted*, No. 16-13714, 2018 WL 1471440 (E.D. Mich. Mar. 26, 2018).  The lack of a medically determinable shoulder impairment further supports this Court's finding that the ALJ did not err when he failed to adopt additional upper extremity limitations in the RFC.

For the reasons set forth above, the Court finds the ALJ did not improperly cherry-pick or mischaracterize evidence, and that the RFC was supported by substantial evidence.  Accordingly, the Court finds that Ms. Steele's second assignment of error is without merit.

### VI.  Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

March 17, 2023

 */s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge